IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


TODD C. SNYDER,                                    Case No. 6:15-cv-02400-SU

                    Plaintiff,

                                                   **FINDINGS AND**
        v.                                         **RECOMMENDATION**

COMMISSIONER, Social
Security Administration,

                    Defendant.
_____

SULLIVAN, United States Magistrate Judge:

        Plaintiff Todd C. Snyder brings this action pursuant to the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of

Social Security (the "Commissioner"). The Commissioner denied plaintiff Supplemental

Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles II and XVI of

the Act. 42 U.S.C. §§ 401 *et seq.*, 1381 *et seq.* For the following reasons, the Court should REVERSE the Commissioner's decision and REMAND for further administrative proceedings.

## PROCEDURAL BACKGROUND

Plaintiff protectively filed for DIB and SSI on June 11, 2012, alleging a disability onset date of September 30, 2011. Tr. 105, 219-20.[1] These claims were denied initially on October 15, 2012, and upon reconsideration on April 10, 2013. Tr. 105-14, 125-40. On April 22, 2013, plaintiff requested a hearing, Tr. 173-74, which was held July 29, 2014, in Eugene, Oregon, before Administrative Law Judge ("ALJ") John Michaelson, Tr. 57-104 (hearing transcript). Plaintiff appeared and testified at the hearing, represented by counsel; a vocational expert ("VE"), Jeffrey Tittelfitz, also testified. *Id.* On August 28, 2014, the ALJ issued a decision finding plaintiff not disabled under the Act and denying plaintiff DIB and SSI. Tr. 30-45. Plaintiff requested review before the Appeals Council, Tr. 25-26, which was denied October 27, 2015, Tr. 1-6. Plaintiff then sought review before this Court.

## FACTUAL BACKGROUND

Plaintiff was born in 1973. Tr. 219. As a child, plaintiff was hospitalized at a psychiatric unit for unclear reasons. Tr. 286. He ran away from an abusive home as a teenager. Tr. 560. He completed eighth grade, having been in special education classes throughout his school years, and was unable to complete his GED as an adult. Tr. 77-78, 95. He has previously worked various jobs, including as a camper assembler, mill worker, and delivery driver. Tr. 96, 244, 562. He is divorced and lives with his four children of teenage or young adult age (including stepson Kyle Williams). Tr. 63, 67, 70. He has a history of cervical degenerative disc disease, and had discectomies and fusions in 2000 and 2011. Tr. 66, 369, 414. He has been diagnosed

---

[1] Citations "Tr." refer to indicated pages in the official transcript of the Administrative Record filed with the Commissioner's Answer. (Docket Nos. 8, 9).

with mild intellectual disability (intellectual development disorder), chronic posttraumatic stress disorder ("PTSD") arising from childhood abuse, and rule-out unspecified neurocognitive disorder. Tr. 568-69. He has tested at a full scale IQ score of 67. Tr. 564.

## LEGAL STANDARD

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). "Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's." *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) (citation omitted); *see also Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005) (holding that the court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation"). "[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quotation omitted).

The initial burden of proof rests upon the claimant to establish disability. *Howard v. Heckler*, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a five-step process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity"; if so, the claimant is not disabled. *Yuckert*, 482 U.S. at 140; 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) & 416.920(c). If not, the claimant is not disabled. *Yuckert*, 482 U.S. at 141. At step three, the Commissioner determines whether the impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Id.*; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the analysis proceeds. *Yuckert*, 482 U.S. at 141. At this point, the Commissioner must evaluate medical and other relevant evidence to determine the claimant's "residual functional capacity" ("RFC"), an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations his impairments impose. 20 C.F.R. §§ 404.1520(e), 404.1545(b)-(c), 416.920(e), 416.945(b)-(c). At the fourth step, the Commissioner determines whether the claimant can perform "past relevant work." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can work, he is not disabled; if he cannot perform past relevant work, the burden shifts to the Commissioner. *Yuckert*, 482 U.S. at 146 n.5. At step five, the Commissioner must establish that the claimant can perform other work that exists in significant numbers in the national economy.

*Id.* at 142; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. Tr. 32. At step two, he found that plaintiff had these severe impairments: cervical and lumbar degenerative disc disease with a history of repeat cervical discectomy and fusion, and a history of borderline intellectual functioning. *Id.* At step three, the ALJ found that plaintiff did not have an impairment or combination thereof that met or equaled a listed impairment. Tr. 32-33. The ALJ found that plaintiff had the RFC to perform light work, with various limitations. Tr. 34. In so determining, the ALJ discounted plaintiff's testimony regarding the severity of his symptoms, and found that plaintiff's activities were consistent with working a forty-hour week. Tr. 34-39. In determining the RFC, the ALJ found no need to accommodate plaintiff's claimed psychological impairments beyond borderline intellectual functioning. Tr. 40. The ALJ also gave no weight to the opinion of examining psychologist David Truhn, Psy.D., finding his opinions inconsistent with other medical evidence in the record. Tr. 42-43. At step four, the ALJ found plaintiff unable to perform past relevant work. Tr. 43. At step five, the ALJ found that plaintiff could make a successful adjustment to other jobs that exist in significant numbers in the national economy, including small products assembler, electronics worker, and garment sorter. Tr. 44. The ALJ thus found plaintiff not disabled within the meaning of the Act, and not entitled to benefits. Tr. 45.

## ANALYSIS

Plaintiff argues that the ALJ erred in five ways: one, by not finding him disabled under Listing 12.05C; two, by improperly disregarding Dr. Truhn's opinions; three, by failing to

properly consider competent lay witness testimony; four, by improperly discounting plaintiff's own symptom testimony; and five, by not meeting his burden to show that plaintiff could perform other work.  The Court should find that the ALJ erred in each of these regards.

## I.      Listing 12.05C, "Intellectual Disability"

Plaintiff argues that the ALJ erred in not finding him disabled under Listing 12.05C, "Intellectual disability."  20 C.F.R. § 404, Subpt. P, App. 1.  Listing 12.05C provides:

> 12.05 *Intellectual disability*: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

*Id.* (italics in original); *see also Kennedy v. Colvin*, 738 F.3d 1172, 1174 (9th Cir. 2013).

"To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim."  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) (italics omitted).  To meet Listing 12.05C, a claimant must meet (1) the so-called "capsule definition" in the introductory paragraph (here, "significantly subaverage general intellectual functioning . . . manifested . . . before age 22"), in addition to the other two "C" criteria of (2) an IQ score between 60 and 70, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.  *See McNatt v. Colvin*, 44 F. Supp. 3d 1040, 1044 (D. Or. 2014).

The ALJ found that plaintiff did not meet Listing 12.05C because he did not have a valid IQ score of 60 through 70, nor a physical or other mental impairment imposing an additional and

significant work-related limitation of function. Tr. 33. In support of these findings, the ALJ stated, "The claimant has performed semiskilled work in the past, and has functioned independently otherwise, establishing that he has retained good adaptive functioning." *Id.*

The ALJ did not properly or sufficiently analyze whether plaintiff meets the elements of Listing 12.05C. First, that plaintiff may have performed certain types of work or functioned independently do not speak to whether he has the requisite IQ score, or "a physical or other mental impairment." They *may* speak to plaintiff's general intellectual functioning, but the ALJ does not appear to have considered this evidence as to that element of the listing. The ALJ has not given a reason to find the IQ score or physical/mental impairment elements lacking.

Second, although the ALJ afforded no weight to Dr. Truhn's opinions (discussed below), he did not discredit or invalidate plaintiff's full scale IQ score of 67, which score satisfies the first 12.05C criteria of an IQ score between 60 and 70. *See Stokes v. Astrue*, No. CV 09-1264-PK, 2011 WL 285224, at *8 (D. Or. Jan. 4, 2011) ("[I]f the ALJ fails to explicitly reject the validity of a claimant's IQ scores, he may not otherwise reject those scores without substantial evidence for doing so."), *report and recommendation adopted*, 2011 WL 284433 (D. Or. Jan. 24, 2011). The ALJ has cited no evidence, and there does not appear to be any in the record, that would call this IQ score into question. *See Nicholson v. Colvin*, 106 F. Supp. 3d 1190, 1197 n.2 (D. Or. 2015) ("The court notes that it could locate no evidence of record suggesting that any IQ testing was not valid. Further, neither party, nor the ALJ, indicated the validity of any test was in question. Accordingly, the court proceeded under the assumption that all of plaintiff's documented IQ tests were indeed valid."). On remand, the ALJ should consider this IQ score to satisfy the relevant element of Listing 12.05C.

Third, the final element of Listing 12.05C—a physical or other mental impairment imposing an additional and significant work-related limitation of function—is satisfied if the ALJ found that plaintiff has another severe impairment at step two of the sequential analysis. *See Pedro v. Astrue*, 849 F. Supp. 2d 1006, 1015 (D. Or. 2011); *Stokes*, 2011 WL 285224, at *10. Although the ALJ did not discuss this element in his analysis at step three, the ALJ at step two found that plaintiff has the severe impairment of cervical and lumbar degenerative disc disease, which constitutes a physical impairment for purposes of Listing 12.05C. On remand, the ALJ should consider this physical impairment to satisfy the relevant element of Listing 12.05C.

The ALJ must also further consider whether plaintiff satisfies the capsule definition element of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." Although the ALJ may here consider plaintiff's work history and ability, if any, to function independently, the ALJ must also consider the substantial circumstantial evidence that would support a finding of subaverage functioning manifested before age 22, such as plaintiff's dropping out of high school, taking special education classes, and failing to earn a GED. Tr. 77-78, 131-32, 562. Other evidence of his subaverage intellectual functioning includes his receiving assistance in managing finances, in maintaining his home, and in caring for his children, Tr. 70, 80, 88, his inability to assist his children with homework, and his difficulty reading, Tr. 73-75, 79. This circumstantial evidence shows deficits in adaptive functioning. *See Pedro*, 849 F. Supp. 2d at 1011-14 (finding that the record provided "ample circumstantial evidence demonstrating onset of plaintiff's intellectual impairment prior to age 22," including attending special education classes, struggling with reading and writing, and having a history of low skilled work); *Hadley v. Colvin*, No. 3:12-cv-00718-KI, 2013 WL 1442182, at *6 (D. Or. Apr. 9, 2013) ("[Plaintiff's] history of special

education, dropping out of high school, current testing in reading and math at the second to fourth grade level, and low skilled work history as a gas station attendant all suggest . . . low mental functioning.").  Further, plaintiff's ability to perform certain work in the past does not necessarily negate that he also manifests significantly subaverage general intellectual functioning.  Plaintiff's work history shows a number of unskilled or semiskilled jobs held for at most two years, and often less than one year.  Tr. 123, 244-55.  This disjointed work history does not controvert subaverage intellectual functioning.  *See, e.g.*, *McGrew v. Colvin*, No. 3:13-cv-01909-SI, 2015 WL 1393291, at *7 (D. Or. Mar. 25, 2015) ("[T]he introductory paragraph of Listing 12.05 requires evidence that deficits in adaptive functioning exist, not evidence that a claimant has no adaptive functioning skills."); *Jones v. Colvin*, 149 F. Supp. 3d 1251, 1260 (D. Or. 2016) ("[P]erforming some sheltered, part-time volunteer work and possessing average living skills and the ability to drive is not inconsistent with Listing 12.05C.").  The ALJ's cursory analysis here does not disprove that plaintiff meets the capsule definition element.[2]

---

[2] Plaintiff also objects to the ALJ's characterization and analysis of his intellectual disability.  *See* Pl. Br. at 15-16 (Docket No. 13).  At step two of the five-step analysis, the ALJ identified plaintiff's impairment as "borderline intellectual functioning," Tr. 32, but at step three referred to "[m]ental retardation," Tr. 33.  In the now-superseded *Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., Text Revision* (2000) ("*DSM-IV-TR*"), an IQ of 67 would have been classified as "mild mental retardation" (assuming the co-occurrence of "significant limitations in adaptive functioning").  *DSM-IV-TR* at 41-43.  However, "borderline intellectual functioning" was a "condition or problem" assigned those with an IQ of 71-84, *id.* at 740; "borderline intellectual functioning" was classified as an "other condition[] that may be a focus of clinical attention," which other conditions were listed separately from mental disorders (such as "mental retardation").  The current *Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed.* (2013) ("*DSM-5*"), terms what was formerly known as "mental retardation" as "intellectual disability," with severity levels "mild," "moderate," "severe," and "profound."  *DSM-5* at 33-38.  The *DSM-IV-TR*'s "mild mental retardation" corresponds to the *DSM-V*'s "mild intellectual disability," which was Dr. Truhn's diagnosis of plaintiff's impairment.  The *DSM-5* retains "borderline intellectual functioning" as an "other condition[] that may be a focus of clinical attention."  *DSM-5* at 715, 727; *see also McNatt*, 44 F. Supp. 3d at 1044 (distinguishing borderline intellectual functioning from intellectual disability).  These "other" conditions or problems, including borderline intellectual functioning, are not mental disorders themselves.

The ALJ thus did not satisfactorily consider whether plaintiff meets Listing 12.05C. Upon remand, the ALJ should reassess whether plaintiff meets Listing 12.05C in accordance with this analysis, including by considering the circumstantial evidence of plaintiff's subaverage general intellectual functioning manifested before age 22, considering and crediting the full scale IQ score of 67, and accounting for the physical impairments the ALJ found at step two.

## II.   The Opinions of Examining Doctor David Truhn, Psy.D.

In June 2014, plaintiff was referred for a comprehensive psychological evaluation with David Truhn, Psy.D. Tr. 558.[3] Dr. Truhn reviewed plaintiff's record, conducted a mental status examination, interviewed plaintiff and his stepson Kyle Williams, and performed various psychometric tests. Tr. 558, 566-68. Dr. Truhn assessed plaintiff as having mild intellectual disability, chronic PTSD, and rule-out neurocognitive disorder. Tr. 568. He opined that plaintiff could not sustain full-time employment because of his intellectual disabilities, PTSD, and pain. Tr. 569. The ALJ, however, concluded that Dr. Truhn's "report is entitled to no weight in evaluating [plaintiff's] abilities and limitations." Tr. 42.

The weight given to the opinion of a physician depends on whether the physician is a treating, examining, or nonexamining physician. *Holohan v. Massanari*, 246 F.3d 1195, 1202

---

*DSM-5* at 715, *DSM-IV-TR* at 731. Borderline intellectual functioning is therefore fundamentally distinct from mild intellectual disability (or mild mental retardation). The ALJ provided no explanation or justification for finding that plaintiff had the severe impairment of "a history of borderline intellectual functioning," Tr. 32, when no medical professional made such a diagnosis, and in fact the only diagnosis in the record is of "mild intellectual disability." Why the impairment is only a *history* is also not explained. Further, like the revisions to the *DSM*, the regulatory definition under Listing 12.05C was changed from "mental retardation" to "intellectual disability," *Kennedy*, 738 F.3d at 1175 n.1, the preferred term of disability advocates, *United States v. Preston*, 751 F.3d 1008, 1010 n.1 (9th Cir. 2014). Regardless of nomenclature, Listing 12.05C "speaks only to the IQ score itself." *Thresher v. Astrue*, 283 F. App'x 473, 475 (9th Cir. 2008). Under either version of the *DSM*, and under whichever label is applied to plaintiff's impairment, his score should satisfy Listing 12.05C's IQ element.
[3] The referral was requested by plaintiff's attorney and Janice Norton of the State Family Pre-SSI Program. Tr. 558.

(9th Cir. 2001) (citing 20 C.F.R. § 404.1527). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may reject it only for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. "An ALJ can satisfy the 'substantial evidence' requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quotation omitted). The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066 n.2.

Agency consulting psychologist Robert Henry, Ph.D., reviewed plaintiff's records and determined that he had a non-severe anxiety disorder, Tr. 150-51, and that any "learning disability" was also non-severe, Tr. 148. Dr. Henry noted that, as to PTSD, the record was "less clear," and that it was questionable whether plaintiff identified any functional limitations due to any PTSD. Tr. 132. Dr. Henry's opinions, therefore, contradict Dr. Truhn's, and the ALJ was required to provide only specific and legitimate reasons supported by substantial evidence to discount Dr. Truhn's opinions. Nonetheless, the ALJ failed to satisfy this standard.

The ALJ first observed that plaintiff's presentation to Dr. Truhn appeared "unnaturally negative, with [plaintiff] showing poor hygiene despite this not being an issue on virtually all other occasions." Tr. 42. Third-party witness Jennifer Foster (plaintiff's son's girlfriend) did note plaintiff's problems with hygiene, however. Tr. 269-70. The ALJ did not sufficiently consider this third-party testimony, discussed below, and, therefore, the record does contain

corroborating evidence regarding self-care. Nonetheless, some medical providers remarked positively on plaintiff's appearance, *see, e.g.*, Tr. 439 ("General Appearance: NAD, pleasant, normal, alert and oriented." (by Chelsea Sloanes, PA-C, Sept. 15, 2010)); 442 (same (by Dr. Orestes Gutierrez, Sept. 13, 2010)), while other providers were silent on the issue. A contradiction regarding hygiene alone does not amount to a sufficient and legitimate reason to assign Dr. Truhn's opinions no weight. *See Franz v. Colvin*, 91 F. Supp. 3d 1200, 1216 (D. Or. 2015) ("[T]he ALJ provided one valid reason backed by substantial evidence to discount [treating physician's] opinion. However, I conclude that this single basis, on the record before me, does not provide specific and legitimate reasons to discount [the physician's] opinions.").

The ALJ mentions that Dr. Truhn reported that plaintiff showed significant pain behaviors, grimacing and apparently unable to sit still. The ALJ states that "[t]hese activities must be viewed with regard to the emergency room presentation in which he clearly magnified his symptoms of pain . . . ." Tr. 42. However, these minor discrepancies do not address any connection between plaintiff's pain behavior and Dr. Truhn's assessment of intellectual disability and PTSD (with anxiety and depression). It is not clear how an assessment of the level of pain plaintiff may be experiencing would affect (or undermine) an evaluation of his psychological conditions and ability to function. Plaintiff's pain presentation may be relevant to a determination of plaintiff's own credibility in reporting his symptoms; however, is unclear what relevance it would have to Dr. Truhn's psychological evaluation of plaintiff. It is true that "[e]ven when an agency explains its decision with less than ideal clarity, [the court] must uphold it if the agency's path may reasonably be discerned." *Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012) (quotation omitted). Here, however, the role that plaintiff's pain behaviors play in the ALJ's determination that Dr. Truhn's opinion deserves no weight cannot be discerned.

The ALJ's evaluation of plaintiff's pain behavior is not a legally sufficient basis to assign Dr. Truhn's entire opinion no weight. *See Russell v. Colvin*, 9 F. Supp. 3d 1168, 1178 (D. Or. 2014) (holding that it was error to reject opinion of examining psychologist, where ALJ did not properly consider the psychological conditions the psychologist assessed the plaintiff as having, independent of limitations imposed by pain). With regard to pain, the ALJ remarked that this was "inconsistent with the general tenor of his treatment records" from other doctors. Tr. 42. However, inconsistency in the "general tenor" of doctors' records is a generalized and impressionistic observation, and is not a legally sufficient *specific* reason to discount Dr. Truhn's opinions entirely. *See Johnson v. Colvin*, No. 3:12-cv-01149-KI, 2013 WL 3119567, at *4 (D. Or. June 18, 2013) ("Here, the ALJ's reason to discount part of [examining physician's] opinion is extremely broad and does not point to any particular piece of evidence.").

The ALJ faulted plaintiff's apparent difficulty completing the Millon Clinical Multiaxial Inventory personality test: plaintiff reportedly said that "he could not understand some of the questions . . . , or that many items were confusing," which the ALJ found "questionable in view of [plaintiff's] ability to work at least at low semiskilled jobs over the course of several years." Tr. 42. This is an inapposite comparison and not a valid basis to discount Dr. Truhn's opinions. It is unclear how one's ability to work "low semiskilled jobs" would require one to have the abstract, self-aware knowledge to complete a personality test, and the ALJ never explains this. *See Glenn v. Colvin*, No. 3:12-cv-00886-AA, 2013 WL 3046871, at *3 (D. Or. June 11, 2013) ("This low-skilled work history is consistent with plaintiff's other evidence demonstrating subaverage general intellectual functioning . . . ."). Rather, an inability to fully understand the test questions is entirely consistent with plaintiff's IQ and his abstract reasoning score, which "indicates that he is a concrete thinker and would have difficulty understanding abstract

concepts," Tr. 565, and could at most work "low semiskilled jobs." *See, e.g.*, *Alexander v. Colvin*, No. 6:15-cv-01960-SB, 2017 WL 461611, at *9 n.10 (D. Or. Jan. 5, 2017) ("The record is clear that [plaintiff] suffers from significant cognitive deficits and 'severely lacks insight into her own issues,' and thus 'is a very poor historian' and 'not a good resource regarding information about herself.'" (citing administrative record)), *report and recommendation adopted*, 2017 WL 461474 (D. Or. Feb. 2, 2017).

The ALJ continued to note that plaintiff's "description of his condition is vague, claiming on one hand that he had always been anxious, but then blaming pain for his inability to focus on the job at hand. He also hinted at a learning disorder." Tr. 42. Plaintiff's inability to describe the nature of his impairments or limitations (including "hint[ing] at a learning disorder") can be expected given plaintiff's IQ and concrete thinking. Also, plaintiff's apparent inability to describe his *own* mental condition does not impugn Dr. Truhn's professional ability to evaluate him. *See Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment . . . ." (quotation omitted)). Additionally, numerous medical providers noted plaintiff's anxious appearance. *See, e.g.*, Tr. 421 ("General Appearance: alert, nervous appearance." (by Dr. Orestes Gutierrez, Feb. 14, 2011)); 433 (same (by Elizabeth Strubel, PA-C, Oct. 11, 2010)); 454 ("Neurologic Exam: appears anxious, depressed." (by Jan Lintz, PA-C, Sept. 25, 2009)). Regardless, plaintiff's statement that he could not focus at present because of pain does not contradict his statement that throughout his life he has been anxious. Being distracted by pain is not exclusive of having anxiety or PTSD. *See, e.g.*, *Peterson v. Comm'r*, 123 F. Supp. 3d 1256, 1262 (D. Or. 2015) ("Moreover, the ALJ failed to discuss [treating physician's] treatment notes from 2011-2012 showing that plaintiff continues to suffer from chronic pain and bouts of PTSD and anxiety that

are not fully controlled with medication."). The ALJ also improperly dismissed plaintiff's anxiety and problems with rumination as merely "situational," which would resolve by his returning to work. Tr. 41, 42. To support this, the ALJ cited plaintiff's rumination about being able to pay bills. Tr. 42. This is an incomplete reference to Dr. Truhn's analysis; the bills were merely one example of a subject of rumination, along with "accomplish[ing] the day to day chores." Tr. 559. The rumination was not limited to the present conditions of unemployment, but was a daily phenomenon. It was error to minimize plaintiff's impairments as situational. *See, e.g.*, *Spelatz v. Astrue*, No. 3:10-cv-06191-SI, 2011 WL 4544085, at *11 (D. Or. Sept. 28, 2011) (holding that discounting of plaintiff's mental impairments as situational was "neither clear and convincing nor supported by substantial evidence").

The ALJ also dismissed Dr. Truhn's PTSD diagnosis because symptoms of that disorder "would be expected to have been present in the intervening years and to have had effects on [plaintiff's] work." Tr. 42. However, Dr. Truhn provided the only psychological evaluation of plaintiff, so it is unclear where a discussion of PTSD symptoms would be expected in the record. Dr. Henry explicitly declined to draw a conclusion about the effects of PTSD on plaintiff's functioning. Tr. 132. It cannot be determined whether PTSD did have any effect on plaintiff's work history either way. As with the effects of plaintiff's intellectual disability on his work history, any specifics about how PTSD impairment might have interfered with his work, or conversely, how he may have successfully worked despite his impairments, are not in the record. Thus, it is not surprising that PTSD symptoms "are not mentioned before Dr. Truhn's examination." Tr. 42. The ALJ, therefore, did not provide legally sufficient reasons to reject the PTSD diagnosis. *See Kittelson v. Astrue*, 533 F. Supp. 2d 1100, 1117-18 (D. Or. 2007) ("The fact that [plaintiff] may not have been experiencing pronounced PTSD symptoms during the

period under review does not negate the possibility that PTSD has played a role in the duration and severity of his depression.").

The ALJ further relies on irrelevant considerations in discounting Dr. Truhn's opinion. The ALJ mentions that plaintiff attended barbecues—although the specific reference in the record is in fact merely to his socializing with two friends, Tr. 561—and that he goes shopping. These examples do not negate impairments of anxiety, pain, or PTSD. *See, e.g.*, *Thom v. Astrue*, No. 10-cv-3069-ST, 2011 WL 3159882, at *11 (D. Or. July 26, 2011) ("That [plaintiff] is able to socialize with a small number of friends outside of the house is not inconsistent with the allegations of her anxiety about leaving the house to go to work or interact with the public."); *Watkins v. Astrue*, 884 F. Supp. 2d 1135, 1144 (D. Or. 2012) ("[E]vidence of this single [social] trip [to New York City] is insufficient to establish . . . that Plaintiff's testimony was not credible regarding her inability to engage in substantial gainful activity . . . ."). Here, plaintiff avoided triggers of anxiety where possible. Tr. 570. That plaintiff used marijuana (although perhaps a valid consideration in assessing plaintiff's own credibility, as discussed below) does not speak to Dr. Truhn's professional diagnosis. And, that certain physical injuries may not be mentioned elsewhere in the record, Tr. 42, is irrelevant to a psychological evaluation of plaintiff.

The ALJ, noting plaintiff's IQ score of 67, stated that this "was consistent with a past and future ability to work," and that plaintiff could "understand[] most verbal commands or instructions." Tr. 42. The ALJ gives no support for these assertions. The ALJ noted that plaintiff's working memory "was no lower than in the low average range, as was his mathematical ability," *id.*, which is, in fact, consistent with Dr. Truhn's opinions, which noted these as plaintiff's stronger suits, Tr. 565. *See Lewis v. Astrue*, No. CV-10-63-SU, 2011 WL 1085254, at *10 (D. Or. Feb. 15, 2011) (finding that evaluating physician properly considered

full-scale IQ score, where he had observed and accounted for higher scores on individual sections), *report and recommendation adopted*, 2011 WL 1042676 (D. Or. Mar. 22, 2011). The ALJ criticized the assessment of plaintiff's processing speed as "in the extremely low range," saying that "this had not been an issue in [plaintiff's] previous work," Tr. 42, although the record shows that plaintiff's lack of speed in working was a source of workplace conflict, Tr. 562. *See Fielder v. Comm'r*, No. 3:14-cv-00523-MA, 2015 WL 1648987, at *4 (D. Or. Apr. 13, 2015) (discussing history of unskilled work as consistent with deficits in intellectual functioning).

The ALJ questioned the validity of Dr. Truhn's administration of the Comprehensive Trails Marking Test, saying that this was not consistent with plaintiff's earlier employment or "the failure of . . . other examiners to note corresponding deficits of such a severe nature." Tr. 42. As with other reasons the ALJ has given for rejecting Dr. Truhn's assessment, the purported inconsistency of these results with previous employment is unclear. Additionally, as to other examiners, this is the only psychological examination in the record, and it is not surprising that other doctors did not note this, or other intellectual impairments. *See Phu Van Hoang v. Astrue*, 266 F. App'x 659, 661 (9th Cir. 2008) ("As they [physicians] had no reason to determine his intellectual capacity while treating him for physical ailments, their failure to discuss his intellectual functioning cannot constitute substantial evidence."); *Hernandez-Devereaux v. Astrue*, 614 F. Supp. 2d 1125, 1146 (D. Or. 2009) ("[The ALJ] criticized his diagnoses as not shared by other examining physicians. This criticism is misplaced given that no other physician administered as thorough an examination or the same psychological tests.").

The ALJ concludes with his own assessment that Dr. Truhn's evaluation describes a person who "would be expected to be institutionalized." Tr. 43. This far-reaching conclusion lacks support in the record (Dr. Truhn makes no such appraisal), and also seems to misinterpret

Dr. Truhn's Mental Residual Functional Capacity ("MRFC") report.  Tr. 572.  *See Smith v. Colvin*, 3:14-cv-01210-PA, 2016 WL 680535, at *7 (D. Or. February 19, 2016) ("The ALJ is not a medical expert and may not make his own medical assessment beyond that demonstrated by the record.").  Contrary to the ALJ's interpretation, Dr. Truhn did not state that plaintiff "in effect . . . ha[d] *no* ability to function" in areas such as interpersonal interaction, reliability, working without supervision, avoidance of disruption from psychological symptoms, traveling, and awareness of work hazards.  Tr. 43 (italics added).  Rather, Dr. Truhn assessed plaintiff as being impaired in these capacities to the extent of "preclud[ing] performance for 15% or more of a 7.5 hour work day," Tr. 572, not the complete inability to perform whatsoever (and thereby requiring "institutionalization").[4]  *See Overman v. Colvin*, No. 6:14-cv-01659-BR, 2016 WL 70463, at *9-10 (D. Or. Jan. 6, 2016) (discussing MRFC designation of "'Category IV' (precludes performance for 15% or more of the 7.5 hour workday)"); *Woll v. Comm'r*, 94 F. Supp. 3d 1198, 1204 (D. Or. 2015) (holding that ALJ erred in discounting examining psychologist's MRFC report, where ALJ, in part, misinterpreted psychologist's limitations).  The interpretation of Dr. Truhn's assessment of plaintiff as someone who would require institutionalization is unfounded.

Thus, the ALJ did not provide specific and legitimate reasons supported by substantial evidence to discount Dr. Truhn's opinions.  On remand, the ALJ should reconsider Dr. Truhn's entire evaluation in light of the Court's analysis, including what weight to assign the evaluation, what impairments or limitations plaintiff has as supported by Dr. Truhn's findings, and whether Dr. Truhn's conclusion that plaintiff is unable to work is valid.

---

[4] In fact, the ALJ conceded upon plaintiff's attorney's questioning the VE that if he took into account document "18-F" (Dr. Truhn's report) regarding plaintiff's ability to function, "that would preclude all work activity."  Tr. 101.

### III.     Lay Third-Party Witness Testimony

Plaintiff argues that the ALJ did not properly consider the testimony of three third-party witnesses: Jennifer Foster, Tr. 268-75, Michael Shum, Tr. 296, and Michael DeBusk, Tr. 297. Foster completed a lengthy third-party function report, and Shum and DeBusk provided handwritten notes.  Foster's describes in detail plaintiff's pain and the limiting effects it has on his capacity to perform basic activities; *e.g.*, Tr. 268, 271, 273; his poor hygiene and personal care, Tr. 269-70; his disposition and work ethic, Tr. 273-75; and the decline in all aspects of his life following surgery and intensification of pain, Tr. 271-75.  Shum comments on how he has seen plaintiff "deteriorate" from pain, Tr. 296; DeBusk describes plaintiff "deteriorating" due to his "debilitating condition," and says that "his quality of life has declined significantly," Tr. 297; both describe plaintiff having been a "hard worker," Tr. 296, 297. The ALJ referenced these statements only in passing.  He states that Foster describes no mental limitations, and that Shum and DeBusk make no reference to "any specific mental or medical problem, or resultant limitations, and neither report indicated the presence of any mental limitations."  Tr. 35.

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).  "Such testimony is competent evidence and *cannot* be disregarded without comment." *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) (quotation omitted, emphasis in original). "[F]riends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition."  *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993).  "Disregard of this evidence violates the [Commissioner's] regulation that he

will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." *Id.* at 919 (quotation omitted).

The ALJ failed to give sufficient consideration to the third-party statements. He gives no reasons, much less germane ones as to each, for disregarding them. It is untrue that Foster mentions no mental limitations, given her description of plaintiff's hygiene problems, Tr. 269-70, which corroborate Dr. Truhn's opinions and speak to plaintiff's mental limitations. The ALJ is correct that Shum and DeBusk do not comment on plaintiff's mental capacity; however, they do describe his physical limitations, and the effect of pain on his activities and abilities. These statements are relevant to the disability analysis, as for instance, the inquiry whether plaintiff meets the third element of Listing 12.05C, or in formulating plaintiff's RFC and assessing his ability to perform other work. For the ALJ to simply point out the absence of certain material from these third-party reports is not to give them the required consideration.

The ALJ also stated in passing that "[a]ny allegation by . . . any third parties . . . are entitled to little weight when they suggest the claimant is more impaired than is allowed for in his residual functional capacity, or is generally 'disabled,'" and "[h]is three third parties give conclusory assertions that he could not work, but do not provide specific limitations showing how all forms of work are precluded. They also describe a far more normal range of daily activities than is consistent with an incapacitated person." Tr. 41. These remarks are not competent, germane reasons to disregard the third-party reports. *See Brown v. Colvin*, No. 2:15-cv-01109-HZ, 2016 WL 4251578, at *5 (D. Or. Aug. 10, 2016) (holding that ALJ erred in providing only "sweepingly generalized treatment" of third-party testimony, where "the ALJ simply determined that the [third-party] statements, in the aggregate, [did not] support a finding that the claimant would be unable to sustain simple work as described in the RFC." (alterations

omitted)).  They are also incorrect as to Foster, who provided numerous specific details about plaintiff's physical limitations and how they would affect his ability to work.[5]  Shum and DeBusk are more detailed than the ALJ acknowledges,[6] and are pertinent even if they do not "show[] how *all forms of work* are precluded," Tr. 41 (emphasis added), which is not the relevant standard in assessing third-party testimony.  *See Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("[L]ay testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence . . . ." (emphasis in original)); 20 C.F.R. § 404.1513(a)(4) ("Evidence from nonmedical sources is any information or statement(s) from a nonmedical source (including you) about *any issue* in your claim." (emphasis added)).  These three witnesses also explain plaintiff's ability to engage in the limited forms of work he was able to do in the past and corroborate why that history does not contravene his present inability to work.  *See Robberstad v. Astrue*, No. 6:12-cv-00253-HA, 2013 WL 427966, at *5 (D. Or. Jan. 31, 2013) (instructing ALJ to reconsider on remand other testimony in light of erroneously excluded lay witness testimony); *Nolley v. Astrue*, No. CIV 08-6277-PK, 2009 WL 2949308, at *10 (D. Or. Sept. 9, 2009) ("The [third party witness] report from [plaintiff's] husband may have corroborated [plaintiff's] testimony or could have impacted the ALJ's determination regarding how [plaintiff's] impairments affected her ability to work.")

---

[5] *E.g.*, Tr. 268 ("[E]ven standing or walking around—even sitting in a basic chair—will break him down . . . ."), 270 ("He cannot sit/tend to the meals and food like he used to due to the pain it causes him to be in those positions."), 271 ("He does the big [grocery shopping] once a month trip and we try to make it as quick as possible . . .  No more than an hour with us all helping.  Small trips he needs to make out of necessity are very short."), 273 ("Squatting, bending, standing, walking, keeling etc. all directly affect his spine and put him in pain.")

[6] Tr. 296 (Shum: "He has tried to work but even the smallest amount of effort can lay him up for days."), 297 (DeBusk: "I have witnessed his deteriorating health and debilitating condition that no longer allows him to enjoy" his former activities of camping, fishing, hiking, and boating.  "He is often unable to get out of bed . . . .").

The ALJ thus erred in failing to account for, or to provide germane reasons for discounting, these third-party reports.  On remand, the ALJ should either properly consider the third-party testimony in his analysis or should provide sufficiently germane reasons as to each witness for discounting their statements.

**IV.    Plaintiff's Symptom Testimony**

The ALJ discounted as "not entirely credible" plaintiff's statements regarding the "intensity, persistence, and limiting effects" of his "medically determinable impairments."  Tr. 43.  The ALJ erred in not properly considering this symptom testimony.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  20 C.F.R. § 404.1529.  First, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptoms, but only to show that it could reasonably have caused some degree of the symptoms.  *Id.*  Second, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  *Id.*  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan*, 246 F.3d at 1208.  General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence.  *Id.*  "[I]f the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Lingenfelter*, 504 F.3d at 1036.  In order to find a plaintiff's testimony regarding the degree of impairment unreliable, the ALJ must make "a credibility determination with findings

sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). The ALJ may consider many factors in weighing a claimant's credibility, including

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). Although "the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged," *id.* at 1282, the ALJ may reject that testimony using ordinary techniques of credibility evaluation and by providing specific reasons supported by the objective evidence in the record, *Thomas*, 278 F.3d at 960. "If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quotation omitted).

The ALJ erred in discounting plaintiff's symptom testimony. The ALJ observed that plaintiff's reported symptoms did not match objective medical evidence, but this alone cannot warrant rejecting his testimony. *Smolen*, 80 F.3d at 1282. The ALJ also found that plaintiff may have exaggerated his symptoms. Tr. 36. While the record does suggest the possibility of some degree of exaggeration, it does not justify the extent to which the ALJ has discounted plaintiff's testimony and disregarded evidence of underlying impairments and plaintiff's experience of pain, in, for example, the minimal degree to which the RFC accounts for plaintiff's pain. The ALJ himself found that plaintiff's cervical and lumbar degenerative disc disease were severe impairments, Tr. 32, and this finding is inconsistent with the ALJ's significant discrediting of plaintiff's subjective testimony. The same evidence that underlays a finding that plaintiff's

cervical and lumbar problems are severe (e.g., the various doctors' diagnoses, the repeated surgeries, the multiple prescriptions for high-potency pain medications, and the medical and nonmedical source descriptions of plaintiff's functioning and limitations) also support a finding that he experienced a degree of significant pain such that his testimony cannot be entirely discounted. *Cobat v. Colvin*, No. 3:13-cv-01866-CL, 2015 WL 4488172, at *7 (D. Or. July 22, 2015) ("The ALJ has not provided clear or convincing reasons for discounting Plaintiff's testimony, and the treatment record as a whole tends to support Plaintiff's symptoms.").

Doctors' reports of certain medical encounters would allow the ALJ to discount some pain testimony due to possible exaggeration. In June 2011, plaintiff had his second cervical fusion to address upper back and neck pain, Tr. 366, 375-81, and by November 2011, plaintiff had reported "almost resolution of his preoperative symptom," Tr. 387. Plaintiff then began complaining of lower back pain. *Id.* Plaintiff visited the emergency department in September 2011, complaining of "significant pain" in his lower back. Tr. 481. However, palpation did not reveal any spasm, and although plaintiff exhibited dramatic pain response behaviors, he also "was clearly moving his back to a moderate degree while performing this activity." *Id.* He later "was able to demonstrate that he could walk well." *Id. See Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004) (holding that that ALJ's reliance on doctor's skepticism regarding plaintiff's "graphic and expansive" pain symptoms was a specific and legitimate reason to discount pain testimony). In November 2011, plaintiff visited Dr. Carmina Angeles for lower back pain, but Dr. Angeles noted that the "symptoms d[id] not match his MRI finding." Tr. 387. Likewise, in July 2012, plaintiff visited Dr. Mark Meyers for lower back pain, and although he did have a herniated disc, "the pain . . . [did] not match where his disc problems [were]." Tr. 402. *See Tippett v. Comm'r*, No. 3:10-cv-1427-BR, 2011 WL 6014015, at *5 (D. Or. Dec. 2,

2011) (holding that ALJ properly discounted plaintiff's symptom testimony where "MRI images of [Plaintiff's] spine reveal no more than mild degenerative changes" (quotation omitted)).

The ALJ also noted that plaintiff had "unremarkable" imaging results.  Tr. 38.  An August 2012 electrodiagnostic study was normal except for neuropathy in the elbow, and "increased insertional activity" in the thoracic region "consistent with benign muscle spasm," despite complaints of pain.  Tr. 483.  A December 2013 electrodiagnostic study was normal following plaintiff's allegedly reinjuring his lower back in May of that year.  Tr. 542, 549. These inconsistencies could constitute specific reasons to somewhat discount his symptom testimony.  *See Ramirez v. Colvin*, No. 1:15-cv-00070-AA, 2016 WL 1465088, at *6 (D. Or. Apr. 12, 2016) (holding that ALJ appropriately discounted plaintiff's pain testimony in part based on inconsistencies with objective imaging studies).  At the same time, however, the ALJ conceded that plaintiff's "history of multiple cervical surgeries, the extent of his treatment, the provision of potent analgesics such as methadone, and his continued absence from work, all indicate that he has severe pain."  Tr. 38.  Various objective measurements are repeatedly found to corroborate the degree of pain.  *E.g.*, Tr. 335 ("a lot of spasm"), 428 ("significant muscle spasm"), 439 ("persisting severe muscle spasms"), 442 ("very significant muscle spasms"); 375 ("bilateral upper extremity weakness consistent with C6-C7 compression consistent with bilateral C7 compression"), 385 ("associated weakness and loss of reflex in the C7 distribution . . . correlates with the MRI finding of disc protrusion at the adjacent level at C6-7"); 414 ("trouble walking because of the severe discomfort"), 372-73 (difficulty walking), 387 (same).  The ALJ's narrative of the medical findings and examinations identifies only the specific data that call plaintiff's testimony into doubt, and fails to consider evidence that support his symptom reports. The ALJ should reconsider plaintiff's testimony in light of the entire record, with special

attention to the most recent medical records, given the ALJ's characterization of the course of the locations of plaintiff's pain and variable nature of his complaints.  *See Stone v. Heckler*, 761 F.2d 530, 532 (9th Cir. 1985) ("[T]he most recent medical report is the most probative.")

The ALJ also discounted plaintiff's testimony based his marijuana use.  Dr. Meyers discussed with plaintiff that marijuana was contraindicated due to concurrent use of narcotics, and plaintiff said that he was "willing to stop using marijuana to get his narcotic medications," following a "long discussion" and entry into a "pain contract"  Tr. 402.  It is irrelevant that marijuana is legal under Oregon law, or that plaintiff had a state-issued medical marijuana card, Tr. 566, as the problem is lack of compliance with medical instruction and failure to adhere to his representations to a medical provider.  This would constitute a legitimate reason for the ALJ to discount part, but not all, of plaintiff's subjective pain testimony.  *See Bradley v. Colvin*, No. 6:14-cv-01489-AA, 2015 WL 13237230, at *3 (D. Or. Nov. 27, 2015) ("An ALJ may properly discount a plaintiff's testimony based on lack of truthfulness about substance use.").

Lastly, the incorrectly rejected opinions of Dr. Truhn and the lay witness statements provide further corroboration and credence to plaintiff's symptom testimony, and as those assessments should be reconsidered, so too should be plaintiff's testimony in light of that evidence.  For this reason too was the ALJ's degree of discounting plaintiff's testimony error.  The ALJ should review his credibility in light of this evidence and the other considerations herein.  *See Longmore v. Astrue*, 783 F. Supp. 2d 1130, 1135 (D. Or. 2011) (requiring ALJ to reconsider plaintiff's subjective testimony in light of improperly rejected physician testimony).

## V.    Plaintiff's Ability to Perform Other Work

Plaintiff argues that the ALJ erred at step five by giving the VE an incomplete hypothetical on which to determine whether plaintiff can perform other work.

When a claimant establishes that he is unable to perform past relevant work, the burden shifts to the Commissioner to prove that the claimant is capable of successfully transitioning to an alternate job within his RFC that exists in significant numbers in the national economy. *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989). To meet this burden, the ALJ may rely on VE testimony, but the hypothetical posed to the VE must consider all of the claimant's limitations supported by the record. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2005). The hypothetical must be "accurate, detailed, and supported by the medical record." *Tackett*, 180 F.3d at 1101. "If a hypothetical fails to reflect each of the claimant's limitations supported by 'substantial evidence,' the expert's answer has no evidentiary value." *Osenbrock v. Apfel*, 240 F.3d 1157, 1167 (9th Cir. 2001) (citation omitted). An ALJ is not required to incorporate limitations based on properly discounted evidence. *Batson*, 359 F.3d at 1197.

As discussed above, on remand the ALJ should reconsider Dr. Truhn's testimony, plaintiff's mental limitations, the third-party statements, and plaintiff's symptom testimony. The VE's hypothetical should account for this evidence. *See, e.g.*, *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) ("The [VE's] hypothetical did not take account of [plaintiff's mental] limitations because of her frequent anxiety and panic attacks, and thereby included incorrect assumptions."). The ALJ should incorporate any additional limitations based on improperly excluded evidence and discredited testimony into the RFC and disability determination.

## VI.    Remedy

It lies within the district court's discretion whether to remand for further proceedings or to order an immediate award of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. Conversely, where the record has been developed fully and further

administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citation and italics omitted). This "credit-as-true" rule has three steps: first, the court "ask[s] whether the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; second, if the ALJ has erred, the court "determine[s] whether the record has been fully developed, whether there are outstanding issues that must be resolved before a determination of disability can be made, and whether further administrative proceedings would be useful"; and third, if the court "conclude[s] that no outstanding issues remain and further proceedings would not be useful," it may "find[] the relevant testimony credible as a matter of law . . . and then determine whether the record, taken as a whole, leaves not the slightest uncertainty as to the outcome of the proceeding." *Treichler v. Comm'r*, 775 F.3d 1090, 1100-01 (9th Cir. 2014) (quotations, citations, and alterations omitted). The court may then "remand to an ALJ with instructions to calculate and award benefits." *Garrison*, 759 F.3d at 1020. If, "even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled," the court should remand for further proceedings. *Garrison*, 759 F.3d at 1021.

At the first step in the credit-as-true analysis, the ALJ erred in rejecting Dr. Truhn's opinion, in not properly considering the third-party testimony, and in discounting plaintiff's own symptom testimony. At the second step, however, the Court finds that outstanding issues remain, and that further administrative proceedings would be useful. In accordance with the analysis herein, the ALJ should reconsider whether plaintiff meets Listing 12.05C; reevaluate the opinions of Dr. Truhn, and determine what mental limitations plaintiff has, if any, and how they affect his ability to work; properly address the third-party statements; reevaluate plaintiff's

credibility; and reconsider plaintiff's ability to work, including by formulating a new VE hypothetical if required. Immediate award of benefits is therefore not justified, and the Court instead recommends remand for further proceedings.

## RECOMMENDATION

For these reasons, the Court should REVERSE the ALJ's decision and REMAND for further proceedings, in accordance with the foregoing analysis.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due July 5, 2017. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

DATED this 19th day of June, 2017.

/s/ Patricia Sullivan
PATRICIA SULLIVAN
United States Magistrate Judge